EUGENE DIXON v. THE STATE.

No. 3603.    Decided June 5, 1907.

**1.—Murder in First Degree—Cooling Time—Murder in Second Degree—Manslaughter.**

Cooling time applies as well between murder in the first degree and murder in second degree, as between murder in the second degree and manslaughter. Brooks, Judge, dissenting.

**2.—Same—Charge of Court—Case Stated.**

Where upon trial for murder the evidence showed that the killing did not occur at the time of the first difficulty, but an hour later, the question of cooling time became a question in the case and a charge on this phase of the law should have been given.

Appeal from the District Court of Bowie. Tried below before the Hon. P. A. Turner.

Appeal from a conviction of murder in the first degree; penalty, death.

The opinion states the case.

*J. W. Hillman,* for appellant.—The charge on manslaughter is too restrictive, and the adequate cause relied upon by the defendant was an assault made by the deceased on him a short time before the homicide, in which deceased cursed and abused him, slapped him in the face, drew a knife on him and threatened to cut his throat and kicked him out of the house. The charge on manslaughter ignored this phase of the case entirely and confined the jury simply to adequate cause arising at the time of the homicide, and fails to call the attention of the jury pointedly and specifically to the adequate cause raised by the testimony a short time prior to the killing, and fails to call the attention of the jury to the matter of cooling time between the assault by the deceased and the homicide. Joe Thomas v. The State, 42 Texas Crim. Rep., 386.

*F. J. McCord,* Assistant Attorney-General, for the State.—The manner of this killing eliminates manslaughter. The defendant coming and getting his gun, loading it, going out of the house, and then creeping up to the window in the dark, and assassinating the deceased shows a cool, calm and deliberate mind; or in other words, shows malice and not passion. Breedlove v. State, 26 Texas Crim. App., 445.

DAVIDSON, Presiding Judge.—Appellant was allotted the death penalty for the murder of his brother. The scene of the homicide was at a house occupied by the deceased, and his wife, appellant, and a younger brother; appellant being younger than deceased. There had never been any trouble between appellant and deceased, until about an hour or such matter before the tragedy. The widow of the deceased, testifying in regard to the troubles that lead up to the tragedy, in substance, stated, there had never been any trouble between the brothers of which she was aware prior to the night of the killing; that herself, appellant, and deceased were sitting at the table; that deceased stated to his brother that he ought to pay his (deceased's) wife for cooking and washing for him. To this appellant entered a demurrer; one word lead to another, until finally appellant rather emphatically stated that he would not pay. Immediately the deceased slapped appellant, which brought on a fist fight, in which several blows were struck. Appellant had his knife, with which he was eating, in his hand; deceased knocked this from his hand, and appellant reached down to get it; deceased thereupon seized the knife, and prevented appellant securing it, and made him leave the premises, and forbade his return. After appellant had been gone something like an hour, as well as the time could be estimated by the witness, he returned, and at the front gate hallooed; the deceased opened the door and inquired his business; appellant informed him that he returned to take his clothing and effects away. Finally it was agreed that appellant should enter the house and get his clothing, and leave. There was some conversation between the parties during the time that appellant was gathering his effects, and finally, after gathering his clothes, he asked for his gun, which had been moved by deceased during appellant's absence, and the cartridges locked in the drawer of the dresser. Appellant finally secured his gun, and asked for the cartridges; these were refused by the deceased with the remark that appellant could get his cartridges to-morrow. Appellant having some cartridges with him, inserted them into the magazine of the gun, and deceased then returned the other cartridges. The State's theory, from this point on, is that appellant went outside of the house, fired off his gun twice, and then shot through the window at deceased, inflicting a mortal wound. Appellant's theory of the matter is somewhat different; he states that he was sitting at the supper table when his brother Charley Dixon informed him that he had to pay board; there came up trouble between them, and the deceased struck him and a fist fight ensued, and appellant drew a knife; deceased knocked the knife out of appellant's hand, and as he stooped to get the knife, deceased drew his and told him if he stooped he would cut his throat. He further testifies that deceased slapped him; caught him by the collar and kicked him out of the house, and told him to stay away, and if he caught him there again he would kill him. Appellant went away to Redwater and got a cap, and came back to the gate and hallooed and asked deceased for his clothing; he was invited to come in and get them; while in there, he

asked for his winchester, which was given him; he asked for his cartridges; these were refused, stating he could get them to-morrow. Appellant had some cartridges in his pocket, and placed them in his gun; he requested the deceased to return the remainder of his cartridges, which he did after he saw appellant place these cartridges in the magazine; he then ordered appellant out of the house, and to stay away from the premises; if he did not do so, he (deceased) would kill him. Appellant here says that he asked his brother how he could stay away from home, that it was as much his home as it was his (deceased's) but the deceased told him to go away and not come back any more. The above is the voluntary statement made by appellant, or a portion of it at least at the examining trial.

Appellant tstified in his own behalf; among other things, he says: " I was sitting down at the supper table, and he (deceased) said I had to pay him board, and I told him I did not think I had any right to pay any board; that I was at home, and one word lead to another, and he got up and slapped me, and he and I passed three or four licks, and I had a case knife in my hand, and he hit me on the arm and knocked the knife out of my hand, and I reached down to pick it up, and he got me by the back of the neck with one hand and had his knife in the other hand." He describes this knife as being a big knife. Upon being asked why he stooped down, he (appellant) replied: "To pick up the knife. That was after we quit fighting, and he got me by the back of the neck and kicked me out and told me to go on out of there, and go on away from there, and I went on out and he came on behind me. I started in the house, and he came in there and got my gun and told me to get out of there and stay, and he went around by the head of the bed and got my gun and made me go clean on away, and followed me to the door with my gun." After his return, appellant stated that he had gotten his clothes and started out of the door, and stopped in the door, and told his brother it was mighty hard for him to go away and leave home because he (his brother) said so; it was as much his (appellant's) as it was his (deceased's) ; that the deceased said, " Go on out," and cursed and ordered him to stay away. "I told him he need not be in such a hurry; no use for us to go on that way; that was all foolishness for brothers to go on that way, and he cursed me again and told me to go out of the door, and he reached back to get his shotgun, and I stepped to the window and shot him." Without going into any further detailed statement in regard to the testimony pro and con, as to the exact condition of things, we think the above is a sufficient statement to bring in review such questions for discussion as is necessary for a decision of this appeal.

The evidence makes it clear, perhaps conclusive, that there had been no difficulty between the brothers prior to the altercation at the supper table, that assumed, before its termination, almost a serious aspect, and appellant was driven away from his home by the deceased. In about an hour appellant returned to secure his property to leave the

premises. Under the State's theory, in securing his gun, he killed his brother; upon appellant's theory, he killed deceased because the deceased had not only ordered him away from home, but was trying to se-cure his shotgun to enforce his demands, or perhaps use it upon him. This is a death penalty conviction. If express malice is in the case at all, it arises from a conclusion to be arrived at from the facts, if there are such facts, that appellant's mind had become cool, deliberate and sedate after the first difficulty, and before the consummation of the design an hour or so later. If the intention to kill was brought about by the first difficulty, it was evidently formed in a mind enraged by passion growing out of the first difficulty; he had been driven from home by the elder brother, in which a knife was used, and under his statement, he had been kicked out of the door into the darkness at an unseasonable hour, and ordered away from their mutual home. If the determination was formed after he returned to secure his clothing and had gotten his gun, on account of the matters then occurring, it could hardly be said to be murder in the first degree, or even if the jury would be warranted in so finding, still there were those facts and circum-stances which required the court to submit to the jury the question of cooling time between the first and second difficulty. Under appellant's statement of the case, there was even manslaughter in the case, had the killing occurred at the time of the first difficulty, and there was also manslaughter in the case at the second meeting under appellant's version of the facts. Cooling time applies as well between murder in the first degree and murder in the second degree as between murder in second degree and manslaughter. In order to have murder in the first degree, the mind must be cool and sedate; there must be express malice aforethought prompting the party committing the homicide. If the intention to kill is formed in the mind enraged by passion without adequate cause, and a sufficient time has not elapsed for the mind to cool to the extent of contemplating the consequences of his act, such as would meet the requirements of murder in the first degree, the offense could be no higher than murder in the second degree, and this phase of the law was not given. It should have been given. Again, if the intention to kill was formed in a mind aroused to sudden passion by adequate cause, and the homicide occurred while the mind was in this condition, it would be no higher offense than manslaughter. The kill-ing not having occurred at the time of the first difficulty, but an hour later, the question of cooling time became a question in the case, and a charge on this phase of the law should have been given. See Thomas v. State, 42 Texas Crim. Rep., 386. It is true the statute says that in order to constitute manslaughter, not only the adequate cause must exist, but the mind must be inflamed by sudden passion to such an extent as to render it incapable of cool reflection. The concurrence of two facts constitutes manslaughter. So cooling time is in the case, from both standpoints. If the sudden passion grew out of provoca-tion at the first difficulty, this presented the issue of cooling time as

to both degrees of the homicide, murder in the second degree and manslaughter. If the killing occurred on account of the second meeting, and the provocation there offered by the deceased, under appellant's testimony, it would be manslaughter from that standpoint as well. The question of cooling time was not charged by the court, and exception was reserved in motion for a new trial.

Because the charge in regard to cooling time and manslaughter was not such as the facts demand, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

BROOKS, JUDGE.—I barely concur in the conclusion reached in this case. It is legally absurd to suggest that the issue of cooling time under the statute ought to be charged between the degrees of murder.